**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE ELEVENTH CIRCUIT**

---

**No. 24-12603-HH**

---

DIMERCO EXPRESS (USA) CORP.,
Defendant - Appellant

v.

KENNY FAULK
Plaintiff – Appellee

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
HONORABLE MICHAEL L. BROWN
CASE NO. 1:21-CV-1850-MLB

---

# RESPONSE BREIF OF PLAINTIFF-APPELLEE

---

Aaron B. Maduff
BARRETT & FARAHANY
77 W. Wacker Dr., 45th Floor
Chicago, Illinois 60601
(312) 276-9000
aaron@justiceatwork.com

Benjamin A. Stark
BARRETT & FARAHANY
2921 Piedmont Road
Atlanta, Georgia 30305
(404) 214-0120
bstark@justiceatwork.com

*Counsel for Plaintiff-Appellee*

**C-1**

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Plaintiff-Appellee, Kenny Faulk, pursuant to Fed. R. App. P. 26.1 and 11th Cir. R. 26.1-1, 26.1-2 and 26.1-3, hereby files her Certificate of Interested Persons and Corporate Disclosure Statement:

1. Barrett & Farahany, LLC, counsel for Appellee
2. Boyd, Nicholas R., counsel for Appellant
3. Brown, Honorable Judge Michael L., United States District Court Judge
4. Burnside, Cynthia G., counsel for Appellant
5. Corbitt, Canon T., trial counsel for Appellant
6. Dimerco Express Corp., related entity of Appellant
7. Dimerco Express (USA) Corp., Appellant
8. Eason, Leslie K., trial counsel for Appellant
9. Farahany, Amanda, counsel for Appellee
10. Faulk, Kenneth, Appellee
11. Fielding, James S., trial counsel for Appellant
12. Gavrilidis, Catherine, trial counsel for Appellee
13. Glasgow, Julia, trial counsel for Appellant
14. Gordon Rees Scully Mansukhani, LLP, trial counsel for Appellant
15. Holland & Knight LLP, counsel for Appellant

16. Jones, David G., trial counsel for Appellant

17. Larkins III, Honorable John K., United States Magistrate Judge

18. Littler Mendelson, P.C., trial counsel for Appellant

19. Maduff, Aaron B., appellate counsel for Appellee

20. Olsen & Brueggemann, PC, trial counsel for Appellant

21. Pabian, Ilene L., counsel for Appellant

22. Panter, Zac, trial counsel for Appellee

23. Peebles, Burton F., trial counsel for Appellant

24. Polsinelli PC, trial counsel for Appellant

25. Rollins, Benjamin J., counsel for Appellee

26. Reid, Patrick J., counsel for Appellee

27. Roberts, V. Severin, trial counsel for Appellee

28. Shultz, Chad, trial counsel for Appellant

29. Stark, Benjamin., appellate counsel for Appellee

30. Stastny, Steven M., trial counsel for Appellant

Respectfully submitted, this 12th day of March 2025.

**BARRETT & FARAHANY**

s/ *Aaron B. Maduff*
Aaron B. Maduff
Georgia Bar No. 548978

## STATEMENT REGARDING ORAL ARGUMENT

While significant, this is a relatively simple case. Oral argument is hardly critical. However, as Defendant-Appellant believes it is necessary to expound upon its view, Plaintiff-Appellee is prepared to respond. Additionally, this is an appeal from a trial with emotional nuances related not only to the depth of Kenny Faulk's experience, but the unusual level of systematic planning of discrimination by Defendant's President, Herbert Liou. The Court may therefore have questions about issues that are not readily apparent on the face of the language in the briefs.

## TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PARTIES AND CORPORATE DISCLOSURE STATEMENT .............................................. i

STATEMENT REGARDING ORAL ARGUMENT .................................. iii

TABLE OF CONTENTS ......................................................................... iv

TABLE OF AUTHORITIES ..................................................................... viii

STATEMENT REGARDING ADOPTION OF BRIEFS BY OTHER PARTIES .................................................... xii

STATEMENT OF JURISDICTION .......................................................... xiii

STATEMENT OF THE ISSUES ................................................................. 1

STATEMENT OF THE FACTS .................................................................. 3

I. DEFENDANT'S PRESIDENT ORDERS HR NOT TO HIRE PLAINTIFF AND LATER ADMITS IT WAS BECAUSE OF PLAINTIFF'S RACE ........................................................................ 2

II. DEFENDANT'S DELIBERATE PLAN TO HIRE SALESPEOPLE BASED ON RACE ............................................................................ 3

III. DEFENDANT'S PRESIDENT CONFIRMS DEFENDANT'S PLAN FOR RACE DISCRIMINATION IN RESPONSE TO MS. HOWARD'S PROTESTS ..................................................... 5

IV. PLAINTIFF LEARNS OF THE DISCRIMINATION. HIS RESULTING EMOTIONAL DISTRESS……………………………6

COURSE OF PROCEEDINGS BELOW ....................................................... 8

STANDARD OF REVIEW .......................................................................... 10

SUMMARY OF THE ARGUMENT ............................................................ 13

ARGUMENT ........................................................................................... 17

I. THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN DETERMINING THAT THE SUSTAINING OF OBJECTIONS AND CURATIVE INSTRUCTIONS WERE ADEQUATE TO REDRESS ITS CONCERNS ABOUT IMPROPER ARGUMENTS FROM PLAINTIFF'S COUNSEL AND A SINGLE IMPROPER QUESTION FROM PLAINTIFF'S COUNSEL ................................................................. 17

a. The District Court Correctly Determined Plaintiff's Counsel's Opening Statement and Closing Argument Were Not So Prejudicial As To Warrant a New Trial……………………………………………..18

b. Cross Examination of Sookie Song…………………………...…22

c. "Other Improper Trial Tactics."………………………………24

II. THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN BALANCING THE ADMISSION OF EVIDENCE PURSUANT TO FED. R. EVID. 403 RELATING TO PLAINTIFF'S 2014 AGGRAVATED ASSAULT CHARGE AND 2019 RAPE CHARGE………………..….25

a. The 2019 Rape Charge ........................................................... 25

b. Exhibit DX-17 Regarding the 2014 Aggravated Assault Charge.......................................................................................... 31

III. THE DISTRICT COURT COMMITTED NO ERRORS AND IF IT COMMITTED ANY, THEY WERE HARMLESS AND NON-CUMULATIVE ........................................................................... 33

IV. THE JURY WAS ENTITLED TO AWARD $300,000 IN COMPENSATORY DAMAGES……………………………………36

V. THE JURY WAS ENTITLED TO AWARD $3,000,000 IN PUNITIVE DAMAGES……………………………………………………...43

a. Reprehensibility……………………………………….……….43

i. Whether Plaintiff Suffered Harm……………………..…….44

ii. Whether the Conduct Evinced Indifference to
Health of Others…………………………………..……….44

iii. Whether the Target Was Vulnerable………………..…….44

iv. Whether the Conduct Was Repeated or Isolated…………45

v. Whether the Conduct Was Intentional, Malicious,
or Deceitful………………………………………..…47

b. Ratio of Compensatory to Punitive Damages………..……49

c. Comparable Cases ........................................................................ 52

d. The Purpose of the *Gore* Analysis ................................................ 55

VI. CONCLUSION........................................................................... 56

CERTIFICATE OF COMPLIANCE ........................................................ 57

CERTIFICATE OF SERVICE .................................................................. 57

# TABLE OF AUTHORITIES

**U.S. Supreme Court Cases:**

*BMW of North America, Inc., v. Gore*, 517 U.S. 559 (1996) .43, 49-50, 55-56

*Carey v. Piphus,* 435 U.S. 257, 263 -64 (1978)........................................... 36

*Honda Motor Co., Ltd. v. Oberg,* 512 U.S. 415, 421 (1994)........................37

*Kolstad v. American Dental Association*, 527 U.S. 526, 534-538 (1999).... 12

*Smith v. Wade*, 461 U.S. 20, 56 (1983)........................................................ 12

*State Farm Mutual Auto Ins. v. Campbell*, 538 U.S. 408 *(2003)* ...... 43, 49-50

**Circuit Court Cases:**

*Access Now, Inc. v. Southwest Airlines, Co.*, 385 F.3d 1324, 1330 (11th Cir. 2004) ................................................................................................................ 31

*Allstate Ins. Co. v. James*, 845 F.2d 315, 318-19 (11th Cir. 1988) .......... 18-21

*Barber v. City of Chicago*, 725 F.3d 702 (7th Cir. 2013)............ 14, 25-27, 30

*Bogle v. McClure*, 332 F.3d 1347 (11th Cir. 2003)....................................... 41

*Bowles v. Osmose Utilities Services, Inc*., 443 F.3d 671 (8th Cir. 2006). 53-54

*Brady v. Fort Bend County*, 145 F.3d 691, 719 (5th Cir. 1998).................... 38

*Bryan v. Jones*, 519 F. 2d 44 (5th Cir. 1975).......................................... 29-30

*Bryant v. Jeffrey Sand Co*., 919 F.3d 520 (8th Cir. 2019)........................ 53-54

*Butcher v. United* States, 368 F.3d 1290, 1297 (11th Cir. 2004) ................. 49

*Cote v. R.J. Reynolds Tobacco, Co.*, 909 F.3d 1094, 1104 (11th Cir. 2018) 20

*Dimanche v. Massachusetts Bay Transportation Authority*, 893 F.3d 1 (1st Cir. 2018) ............................................................................................... 50-51

*EEOC v. W&O Inc*., 213 F3d 600 (11th Cir. 2000)...................................... 53

*Evans v. Port Authority of New York & New Jersey*, 273 F.3d 346 (3rd Cir. 2001) ........................................................................................................ 42

*Ferrill v. The Parker Group, Inc.*, 168 F. 3d 468, 476 (11th Cir. 1999) 36, 38

*Forshee v. Waterloo, Indus., Inc.*, 178 F.3d 527 (8th Cir. 1999) .................. 40

*Goldsmith v. Bagby Elevator Co., Inc.* 513 F.3d 1261, 1283 (11th Cir. 2008 .) ......................................................................................43-44, 51, 53

*Gore v. Turner*, 563 F.2d 159, 164 (5th Cir.1977) ...................................... 37

*Lambert v. Fulton County, Georgia*, 253 F.3d 588, 597 (11th Cir. 2001)11-12

*Lampley v. Onyx Acceptance Corp*., 340 F.3d 478, 485 (7th Cir. 2003) ..... 41

*Marable v. Walker*, 704 F.2d 1219, 1220 (11th Cir.1983)).......................... 37

*Mays v. United States Postal Service*, 122 F.3d 43, 46 (11th Cir. 1997) ...... 12

*McWhorter v. Birmingham*, 906 F.2d 674 (11th Cir. 1990) ..................... 20-21

*Price v. City of Charlotte*, 93 F.3d 1241 (4th Cir. 1996)............................... 38

*Rubinstein v. Yehuda*, 38 F. 4th 982, 988-89 (11th Cir. 2022)....................... 49

*Saccameno v. U.S. Bank National Association*, 943 F.3d 1071 (7th Cir. 2019) ........................................................................................................ 50-51

*Schandelmeier-Bartels v. Chicago Park District*, 634 F.3d 372 (7th Cir. 2011) ........................................................................................................ 39-40

*Sooroojballie v. Port Authority of N.Y. & N.J.*, 816 Fed. Appx 536 (2d. Cir. 2020) ........................................................................................................ 50-51

*Stallworth v. Shuler*, 777 F. 2d 1431, 1435 (11th Cir. 1985) ........................ 37

*Sykes v. McDowell* 786 F.2d 1098, 1105 (11th Cir. 1986)...................... 41, 43

*Thomas v. iStar Financial Inc.*, 652 F.3d 141 (2d Cir. 2011) ................. 50-51

*United States v. Baker*, 432 F.3d 1189, 1223 (11th Cir. 2005) ..................... 35

*United States v. Brown*, 413 F.3d 1257, 1265 (11th Cir. 2005) .................... 10

*United States v. Colston*, 4 F.4th 1179, 1192 (11th Cir. 2021) .................... 23

*United States v. Graham*, 123 F. 4th 1197, 1283 (11th Cir. 2024)................. 34

*United States v. Jeri*, 869 F.3d 1247, 1259 (11th Cir. 2017)......................... 17

*United States v. Jernigan*, 341 F.3d 1273, 1285 (11th Cir. 2003)................ 11

*United States. v. Ochoa*, 941 D.3d 1074, 1106 (11th Cir. 2019)................... 35

*United States. v. Weinstein*, 762 F.2d 1522, 1542 (11th Cir.1985) ..........20-21

*Williams v. ConAgra Poultry Co*., 378 F. 3d 790 (8th Cir. 2004)............50-53

*Williams v. First Advantage LNS Screening Solutions, Inc.*, 947 F. 3d 735, 751 (11th Cir. 2020).......................................................................................... 44

*Willingham v. Loughnan*, 261 F.3d 1178, 1185 (11th Cir. 2001) ................ 47

*Wilson v. Taylor*, 733 F.2d 1539 (11th Cir. 1984)...................................39-40

**<u>District Court Cases</u>**

*Buford v. United States*, 532 U.S. 59, 65, 121 S. Ct. 1276, 1280, 149 L. Ed. 2d 197 (2001) ...................................................................................................... 11

*Chopourian v. Catholic Healthcare West*, 2012 U.S. Dist. LEXIS 60327 (E.D. Cal. 2012) ...................................................................................................... 54

*Copley v. BAX Global, Inc.*, 97 F. Supp. 2d 1164 (S.D. Fla. 2000) ............. 53

*Cuevas v. Wentworth Group*, 226 N.J. 480 (N.J. 2016) ............................... 42

*Pierce v. Underwood*, 487 U.S. 552, 560, 108 S. Ct. 2541, 2547, 101 L. Ed. 2d 490 (1988) ...................................................................................................10-11

*Wilton v. Seven Falls Co*., 515 U.S. 277, 289, 115 S. Ct. 2137, 2144, 132 L. Ed. 2d 214 (1995) ............................................................................................... 11

**<u>State Supreme Court Cases</u>:**

*LIAT (1974) v. Cherubin*, 77 V.I. 472 (Virgin Islands 2022)........................ 41

**State Appellate Courts:**

*Bihun v. AT&T Information Systems, Inc.*, 13 Cal. App. 4th 976 (Cal. 2nd Dist. 1993) .......................................................................................................... 42

*Myers v. Central Florida Invs., Inc.*, 592 F.3d 1201 ................................... 45

*Baines LLC v. Arco Products Co*., 405 F.3d 764 ...................................53-54

## STATEMENT REGARDING ADOPTION OF BRIEFS BY OTHER PARTIES

Plaintiff-Appellee does not adopt any portion of briefs by other parties in this matter.

## STATEMENT OF JURISDICTION

Plaintiff agrees with – and adopts – Defendant's Statement of Jurisdiction.

## STATEMENT OF THE ISSUES

I. Whether the District Court abused its discretion in determining that its sustaining of objections and curative instructions were adequate to redress its concerns about improper arguments and an improper question from Plaintiff's counsel.

II. Whether the District Court abused its discretion in its efforts to balance probative value versus prejudice pursuant to Fed. R. Evid. 403 when it **[1]** excluded a document containing inadmissible criminal history (but permitted testimony regarding admissible information from that document) and **[2]** excluded testimony regarding a highly inflammatory criminal charge (which did not lead to conviction) that bore miniscule relevance to the issue of emotional distress.

III. Whether the District Court abused its discretion in determining that there were not errors that, cumulatively, required a new trial.

IV. Whether the District Court abused its discretion in not offering to remit the Jury's award of $300,000 in compensatory damages based on a $90,000 back pay award and his view that Plaintiff was "profoundly" anguished and humiliated.

**V.** Whether Defendant's plan to systematically discriminate against African-Americans, forced upon upper and middle management by Defendant's leadership, and enabled by its head officer for legal compliance because she believed that African-Americans could not do the job, was sufficient to support the Jury's award $3,000,000 in punitive damages.

## STATEMENT OF THE FACTS

Kenny Faulk ("Faulk" or "Plaintiff") brought this case alleging race discrimination for the denial of a sales representative position with Dimerco Express (USA) Corp. ("Dimerco" or "Defendant") based on a conditional offer of employment and a recission of that offer because of his race.

### I. DEFENDANT'S PRESIDENT ORDERS HR NOT TO HIRE PLAINTIFF BECAUSE HE IS BLACK.

In September 2019, Dimerco provided Faulk with a formal offer letter for a sales position. (USCA11#23:84).[1] On September 26, Sookie Song, Atlanta Office Branch Manager, forwarded a copy of Faulk's background report, to Herbert Liou, Dimerco's President of the Americas, and Renee Howard, Dimerco's HR Recruiter (who had recruited Faulk) (DE#164-7:1; USCA11#23:79; DE#168:108). The report identified Faulk as "black". (DE#164-7:1). Liou confirmed at trial that he learned of Faulk's race from this email. (DE#168:73-75). Liou responded directing Song and Howard to rescind the job offer. (DE#164-2:1-2; DE#168:91). Howard complied. (USCA11#23:84).

Thereafter, Dimerco/Liou hired Tanner Thibodeaux, a white man, for the same position. (DE#164-9:1-3; DE#164-13:1; DE#168:91-92; DE#168:144). After

[1] Plaintiff-Appellee cites to three sources for the record. **[1]** Record cites from Defendant-Appellant's Appendix are "DE#[docket number]:[page]." **[2]** Citations to the documents attached to the December 5, 2024 joint motion to supplement the record are cited as "USCA11#23:[page number]." **[3]** Record cites from Plaintiff-Appellee's Appendix – to be filed after this brief – are cited as "PE#[docket number]:[page]."

extending a conditional offer to Thibodeaux, Dimerco received his background check, which showed numerous criminal convictions, including disorderly conduct and obstruction. (DE#164-9:1-3; DE#164-32:5, 13-14; DE#164-37:1-2). Expecting Liou to reject Thibodeaux as it had Faulk, Howard and Dimerco's Dallas Branch Manager, sought guidance from Liou. (DE#164-4:1-3; DE#164-32:13-14; DE#164-37:1-2; DE#169-2:249-52). Liou directed them hire Thibodeaux. (DE#164-4:1-3; DE#169-2:249-52).

Howard subsequently approached Liou and questioned why Dimerco was hiring the account executive with a more significant criminal history when Liou had directed her not to hire Faulk. (USCA11#23:85). In response, Liou explained to Howard that he only wanted to hire whites. Liou justified his position by stating that whites could get in the door with customers where minorities could not. (USCA11#23:85).

## II. DEFENDANT'S DELIBERATE PLAN TO HIRE SALESPEOPLE BASED ON RACE.

Dimerco's top leaders, Liou and Paul Chien, Dimerco's Founder[2], had long before discussed a plan to hire white sales professionals to pursue large accounts. They met on March 19th, 2018, where Liou interviewed with Chien for President of

[2] (DE#168:63-64).

Dimerco USA. (DE#168:63-64; PE#164-38:11163). He provided a series of written plans which included the following:

> - "**Hiring Caucasian Sales & Marketing Manager/VP in LAX/NYC respectively.**" (DE#168:63, 67-68; PE#164-38:11158).
>
> - "**Continue Pairing Concept by leveraging Caucasian Sales & Marketing Manager/VP and Ted to assist local office closing sizeable A/C**" (DE#168:63, 68; PE#164-38:11158).

At trial, Liou testified that Dimerco wanted a Caucasian sales and marketing manager "to attract the Caucasian market". (DE#168:68). Liou's had a plan to "pair" white sales professionals with what Dimerco perceived as a white prospective client base. Chien approved this plan and promoted Liou to President of Dimerco. (DE#168:63-64, 69).

Liou and Chien explained their plan to select sales managers based on race. Howard further affirmed this plan's existence and operation at Dimerco in her testimony. (USCA11#23:97-98). Cathy Chou, Dimerco's official responsible for legal compliance,[3] testified that some of Dimerco's Chinese customers ship ginseng and if you have "African American salespeople, they don't know about a ginseng". (USCA11#23:49-51).

[3] (USCA11#23:17, 20-23, 35).

In October 2019, Renee Howard presented a PowerPoint at a Dimerco Human Resources management meeting. (USCA11#23:91-92; PE#164-5:47). According to it the "Ideal Sales Candidate" is "American and Caucasian preferred". *Id*.

## III. LIOU CONFIRMS DEFENDANT'S PLAN FOR RACE DISCRIMINATION IN RESPONSE TO HOWARD'S PROTESTS.

In January Howard emailed Liou, concerned about the direction to find only white job candidates for sales positions. (USCA11#23:94-95; DE#168:98-99; PE#164-6:6614-17). She stated that they were "discriminating to search for candidates base[d] on age and race." (USCA11#23:94-96; DE#168:98-100; PE#164-6:6614-15).

Liou prepared a draft email for Legal Compliance Director Chou, to respond to Howard. (USCA11#23:45-46; DE#168:100-101; PE#164-6:6614). He stated, "to ensure in hiring appropriate Sales in the organization, I would like you to understand the Character of Sales to fit our Biz: a) DIMUS is focusing on Caucasian Market b) We need young person to be Sales and mature People to be Sales Management". (USCA11#23:45-46; DE#168:100-102; PE#164-6:6614). Chou advised Liou not to put in writing that he/the company was seeking "a specific race and age." (USCA11#23:45-46; PE#164-26:8886):

> If we puts (*sic.*) in writing that you want a specific race and age, Both you and the company are guilty of discrimination and if we ever get a legal complaint, these emails will result in **a guilty verdict and large damage award**.

*Id*. (emphasis added). Chou did not tell Herbert Liou not to discriminate based on race; she simply advised him to reword the email. (USCA11#23:46) ("Keep in mind, I report to Herbert. Okay. And I cannot point a finger to him, say, this is, you know – but I did stop him. I say, 'You should not – you know, the wording, this is not appropriate. I need to rewrite it.") At trial, Liou reaffirmed that the company was pursuing a white/Caucasian customer base. (DE#168:101-102).

## IV. PLAINTIFF LEARNS OF THE DISCRIMINATION. HIS RESULTING EMOTIONAL DISTRESS.

In April 2021, Howard messaged Faulk: "Shortly after they rescind (*sic.*) your offer, they hired a white man with a record. The hiring manager really wanted you, but the president didn't want to hire any other race. . . .The manager kept pressing for you, but was finally told by the president no minorities." (DE#168:199-201).

Faulk testified that upon learning that he never had a chance at this job because of his race he felt "sad," "upset," "angry," and "hurt." (DE#169-2:52). He was a defective candidate by virtue of being a black man. He testified that the entire exercise (and all his preparation for it) was a waste of time and effort. (DE#169-2:52). He explained it was "discouraging" because it made him think "well, what did I spend all of those years going to college for, [] getting my bachelor's and my master's for what? And I can't even get this position because [they]'ve already got [their] mind made up. (DE#169-2:52-53). He explained that Howard had told him

that he "had all the credentials" and that "there wasn't a better candidate out there," but that it never really mattered. (DE#169-2:56).

As the District Court explained, based on its in-person observations:

> The Court observed Plaintiff throughout trial and particularly while he testified. Plaintiff's demeanor conveyed the embarrassment and pain he experienced because of Defendant's actions. The Court has difficulty adequately describing his demeanor other than to say Plaintiff's body language, tone of voice, and overall appearance while testifying about how he felt when he learned he had been denied employment because he is black evidenced profound sadness, anguish, and humiliation. The Court finds Plaintiff's testimony recounting Defendant's conduct and his resultant emotional suffering was sufficient to support the jury's award of emotional distress damages.

(DE#220:37).

**COURSE OF PROCEEDINGS BELOW**

Plaintiff commenced this action on May 4, 2021 in the U.S. District Court for the Northern District of Georgia, alleging race discrimination in violation of 42 U.S.C. § 1981 ("Section 1981"). (DE#1). An Amended Complaint was filed on June 24, 2021. (DE#10). Defendant filed its Answer on June 29, 2021. (DE#12).

The jury trial was held on October 16-19, 2023 before the Honorable Michael L. Brown. (DE#237; DE#168; DE#169-2; DE#170). The jury unanimously determined that Dimerco did not hire Mr. Faulk because of his race. (DE#160:1-2). The jury unanimously awarded Mr. Faulk 1) $90,000 in lost wages; 2) $300,000 in damages for emotional distress; and 3) $3 million in punitive damages. (DE#160:2-4).

Defendant now appeals with a finite set of issues the relevant facts for which will be addressed in more detail below. First, while Defendant has painted a picture of a trial wholly infected with error, its complaints relate to five items: A) two statements in Plaintiff's opening and closing, B) an inadvertent nod of the head and smile by Plaintiff's counsel, C) the rejection of a defense exhibit showing a criminal charge against Plaintiff that added no information that was not already in evidence by testimony; D) a question on cross-examination about the aforementioned exhibit; and E) the exclusion of a charge of rape against the plaintiff for which he was not convicted and upon which the Defendant did not rely in rescinding the job offer.

The District Court competently addressed each of these points, sustaining objections before the jury, adding instructions where it deemed it appropriate, and specifically noting that the jury was not affected by them. Second Defendant appeals the $300,000 compensatory damages award as excessive and the punitive damages award as excessive.[4]

[4] Defendant also asks the Court to vacate the attorney fee award with no argument. It is premature in any case.

## STANDARD OF REVIEW

With respect to Defendant's Motion for New Trial it has correctly stated that the standard of review is an abuse of discretion. It has also correctly noted that to reverse, this Court must be assured that Defendant faced "substantial prejudice." (Def. at 12-13 *citing cases.*) Defendant also correctly applies that standard to the compensatory damages award. *Id* (citing cases.) But as will be seen, Defendant gives only lip service to that standard throughout its brief.

The abuse of discretion standard likewise applies to a district court's determination on how to remedy errors whether by sustaining objections or providing (or not providing) curative instructions. *See Vinson v. Koch Foods of Ala., LLC* 12 F. 4th 1270,1288 (11th Cir. 2021) ("Our review is limited to abuse of discretion, as only the trial judge "had the opportunity to hear the offensive remarks within the context of the arguments and to view their effects on the jury.")

This Court, not infrequently, finds it necessary to remind litigants of the reasons for the abuse of discretion standard. It is particularly apropos in this case given the District Court's careful explanation of its perspective on the witnesses demeanors, nature of the testimony, and its effect on the jury. This Court addressed that issue extensively *United States v. Brown*, 413 F.3d 1257, 1265 (11th Cir. 2005):

> We defer to district courts on their evidentiary rulings for at least a couple of reasons. One is that the district court's role in presiding over trial proceedings means the district court is in the best position to decide the matter. *Pierce v. Underwood*, 487 U.S. 552, 560, 108 S. Ct. 2541,

> 2547, 101 L. Ed. 2d 490 (1988). "Inherent in this [abuse of discretion] standard is the firm recognition that there are difficult evidentiary rulings that turn on matters uniquely within the purview of the district court, which has first-hand access to documentary evidence and is physically proximate to testifying witnesses and the jury." *United States v. Jernigan*, 341 F.3d 1273, 1285 (11th Cir. 2003). Being at the trial as the proceedings occur and the evidence unfolds, a trial judge has an advantageous familiarity with the proceedings and "may have insights not conveyed by the record" about the evidence and the issues relating to it. *Pierce*, 487 U.S. at 560, 108 S. Ct. at 2547. Duplicating that familiarity and those insights at the appellate level is impractical and often impossible. *Id.; see generally Wilton v. Seven Falls Co*., 515 U.S. 277, 289, 115 S. Ct. 2137, 2144, 132 L. Ed. 2d 214 (1995) ("The reviewing attitude that a court of appeals takes toward a district court decision should depend upon the respective institutional advantages of trial and appellate courts." (citation and quotation omitted)).
>
> A second reason we give considerable deference to the trial court on evidentiary issues is that it is often not possible to precisely calibrate rules for the many different circumstances that can arise. How to apply evidentiary rules in all possible scenarios is not a matter amenable to close regulation, because the circumstances that arise during trial "involve multifarious, fleeting, special, narrow facts that utterly resist generalization." *Pierce,* 487 U.S. at 561-62, 108 S. Ct. at 2548 (quotation omitted). Evidentiary issues often do not involve a "generally recurring, purely legal matter" or a "question readily resolved by reference to general legal principles and standards alone." *Buford v. United States*, 532 U.S. 59, 65, 121 S. Ct. 1276, 1280, 149 L. Ed. 2d 197 (2001) (justifying deferential review of a particular sentencing guidelines issue). Instead, they almost always present a question that "grows out of, and is bounded by, case-specific detailed factual circumstances. And the fact-bound nature of the decision limits the value of appellate court precedent . . . ." *Id.* at 65, 121 S. Ct. at 1280-81.

With respect to review of the punitive damages issues, Defendant has cited to *Lambert v. Fulton County, Georgia*, 253 F.3d 588, 597 (11th Cir. 2001) for the proposition that this Court applies a *de novo* review while deferring to the District

Court's factual findings. Defendant is only partially correct. *Lambert* (and other cases) support the proposition that a *de novo* standard of review applies to the question of whether punitive damages are appropriate *at all* in applying *Kolstad v. American Dental Association*, 527 U.S. 526, 534-538 (1999). Specifically, *Lambert* cites *Kolstad* for the proposition that "the *Smith* [*v. Wade*, 461 U.S. 20, 56 (1983)] standard for an award of punitive damages in an employment discrimination case is satisfied by a showing of either an evil intention to deprive a plaintiff of his federally protected rights or a conscious indifference to those rights." *Lambert* at 597. However, when it comes to the *amount* of punitive damages, *Lambert* is equally clear that "[w]e 'will not overturn a denial of a Rule 59 motion absent an abuse of discretion.'" (*Lambert* at 598 *quoting Mays v. United States Postal Service*, 122 F.3d 43, 46 (11th Cir. 1997)).

## SUMMARY OF THE ARGUMENT

Defendant has listed seven issues in this case although they appear to only argue five. Issue I relates to the District Court's handling of statements made by Plaintiff's counsel in opening and closing arguments, a question on cross examination, and some inadvertent nodding and smiling. Issue II relates to the decision to admit testimony regarding a 2014 assault charge against Plaintiff (but not the charge itself) and exclusion of a 2019 rape charge – neither of which resulted in convictions for those charges. Issue III is an argument of the cumulative effect of these alleged errors. Issue IV is a challenge to the compensatory and punitive damages awards. And a second Issue IV is a challenge to the award of attorney fees if this Court were to reverse the District Court.

During her opening statement, Counsel for Plaintiff referenced the fact that Plaintiff brought the case to the jury to take appropriate action but used the cliche of passing a torch. In her closing argument, she called it a "mantle." While it is true that the District Court took issue with Counsel's comments, it was "confident that [the] jury ha[d] not been impacted." This determination was well within the Court's discretion, notwithstanding Defendant's effort to magnify those issues in this appeal. The same holds true for the one question Plaintiff's counsel asked in cross-examination which Defendant felt implied that there was no other evidence of certain criminal charges against Plaintiff when specific documents were excluded from

evidence. Because the District Court properly used its tools of sustaining objections and providing curative instructions as it felt appropriate and otherwise balancing its decisions pursuant to the Rules of Evidence, it did not abuse its discretion and made no error at all, let alone a harmful one.

The District Court permitted Defendant to reference a 2014 criminal charge for aggravated assault but barred it from actually putting the document into evidence. This once again reflects a proper use of its discretion in balancing probative value of the evidence and undue prejudicial effect. With respect to the 2019 rape charge, Defendant complains that the District Court had originally intended to admit evidence of it because it could provide an alternative basis for emotional distress damages Plaintiff was claiming but then reversed that decision at trial. Defendant fails to note that the situation had changed at trial because Plaintiff did not testify about general emotional distress, but rather emotional distress specifically related to the discrimination he suffered. The District Court did a proper analysis applying principles it found useful from *Barber v. City of Chicago*, 725 F.3d 702 (7th Cir. 2013) and did not abuse its discretion.

Defendant's argument that, even if the aforementioned "errors" are not themselves harmful, their cumulative effect is harmful is unavailing. First, as already noted, the issues Defendant raises are subject to an abuse of discretion standard and the District Court did not abuse its discretion. The standards for a new

trial because of an accumulation of harmless errors is not met given the strong evidence in the case, the corrective action by the court, the short length of trial, and the fact that they bear no substantive relationship to each other to have a cumulative effect.

Defendant next argues that Plaintiff's "conclusory" statements that he was sad and angry do not support an award of $300,000 in compensatory damages. Whether such testimony on its own would have done so is irrelevant because Defendant's representation is neither consistent with the record, nor consistent with the District Court's perspective on Plaintiff's testimony. While Plaintiff provided the conclusions that he was sad and angry and frustrated, he explained that he had spent considerable life resources educating himself and building experience and a resume only to find that it never mattered because of the color of his skin. The District Court described Plaintiff's demeanor as "evidenc[ing] profound sadness, anguish, and humiliation." (DE#220:37). The District Court's ability to assess the testimony is precisely why this decision is subject to an abuse of discretion standard and the District Court's explanation is clear evidence that it used its discretion properly.

As to punitive damages: Defendant's discrimination in this case was blatant, admitted, systemic and motivated by pecuniary reasons. It came from the President who overruled lower-level management trying to stop it, and it was abetted by the legal compliance officer who felt that African-Americans do not understand ginseng.

So, she tried to word things to avoid getting caught because she knew that if they got sued it would result in "a guilty verdict and a large damage award."

Meanwhile, the District Court's application of the three factors (reprehensibility, ratio of punitive damages to compensatory damages, and comparison to similar cases) demonstrates that it was well within its discretion to uphold the jury's award.

Finally, Defendant's request that this Court vacate the District Court's award of attorney fees is wholly dependent upon this Court first reversing all finding of liability on appeal which Plaintiff argues this Court should not do.

## ARGUMENT

### I. THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN DETERMINING THAT THE SUSTAINING OF OBJECTIONS AND CURATIVE INSTRUCTIONS WERE ADEQUATE TO REDRESS ITS CONCERNS ABOUT IMPROPER ARGUMENTS FROM PLAINTIFF'S COUNSEL AND A SINGLE IMPROPER QUESTION FROM PLAINTIFF'S COUNSEL.

The District Court took strong issue with Plaintiff's counsel's conduct during trial. Indeed, it went to the effort in its opinion to note that "While … the Court does not find counsel's actions (either individually or collectively) to warrant a new trial, the Court stands by its discussion about her behavior during trial." (DE#220:4). In that one sentence, the District Court also demonstrates its careful application of the standard of review on the issue before it. The issue is not whether Plaintiff's counsel's conduct was proper or improper, minor or egregious, but rather whether Defendant suffered "substantial prejudice … (or, stated somewhat differently, [whether Defendant suffered] substantial injustice)." *United States v. Jeri*, 869 F.3d 1247, 1259 (11th Cir. 2017) (internal citations omitted).

Defendant has identified three acts of alleged misconduct which it claims entitle it to a new trial. The first relates to roughly 10 sentences in Plaintiffs' opening and closing argument. The second relates to a question on cross-examination of Sookie Song it argues mislead the jury about the reason that Plaintiff's offer of employment was rescinded. And the third relates to an inadvertent nod and smile by Plaintiff's counsel at her client. The District Court found that, with its acts to

cure and its observations of the jury, Defendant's rights were not substantially prejudiced.

**a. The District Court Correctly Determined Plaintiff's Counsel's Opening Statement and Closing Argument Were Not So Prejudicial As To Warrant a New Trial.**

When reviewing whether the comments in Plaintiff's opening and closing caused Defendant substantial prejudice, the District Court was required to consider "the entire argument, the context of the remarks, the objection raised, and the curative instruction … were 'such as to impair gravely the calm and dispassionate consideration of the case by the jury.'" *Allstate Ins. Co. v. James*, 845 F.2d 315, 318-19 (11th Cir. 1988). Clearly, they did not.

The comments at issue were as follows: In opening statement Plaintiff's counsel noted "[y]ou're also going to hear from [Plaintiff] about why he brought his case… [w]hy he took the torch from Renee [Howard], who gave up, to be able to hand it over to you. And he's going to tell you how hard it is fight against corporate power." (DE#237:270). The statement ended with the following language "Listen to see if they take any responsibility for these actions…[a]nd what it will take from the eight of you in this box to make them hear you." (DE#237:274). In closing argument, Plaintiff's counsel stated that Plaintiff had "carried this mantle, and brought it from [Renee Howard] to him. And he picked it up. And he brought it here so that he could come all the way to this courtroom and bring it and turn it over

to you." (DE#169-2:362). She also stated "[i]t is up to you to give a verdict in this case. It us up to you to bring justice in this courtroom, in this country and in this community." (DE#169-2:362).

Defendant objected and the Court sustained the objection before the jury, ordering that the statement regarding the "mantle" be stricken. (DE#169-2:362). The District Court concluded later that day that these curative actions were enough. (DE#169-2:369-70) ("I think the jury got from your objection and my sustaining the point that it wasn't okay."). After considering the matter further overnight, the District Court was confident that the jury had "a fair view of the evidence" and was not "impacted by the one comment." (DE#170:13).

Defendant relies heavily on *Allstate* for its argument that the comments prejudiced the jury. But the difference between what the District Court saw of the jury before it and what this Court described in *Allstate* is dramatic. Here Plaintiff's counsel was asking the jury to do its job. She was arguing that Plaintiff had brought a case and that it was the jury's duty to "give a verdict" and to "bring justice." By comparison, this Court noted in *Allstate* that counsel for Allstate had argued to the members of the jury that they personally would suffer in the form of rising insurance premiums if they found in favor for plaintiff: "Despite Allstate's assertion to the contrary, the remarks were highly inflammatory and tailored to appeal to the listener's self interest. Every individual who drives a car, owns a home, or carries

health or malpractice insurance has felt the effect of the recent insurance crisis." *Allstate*, at 319.

Defendant also relies heavily on *McWhorter v. Birmingham*, 906 F.2d 674 (11th Cir. 1990). First, the trial court in *McWhorter* exercised its discretion in *granting* a new trial because in its view, the violations infected the jury's deliberations. *Id*. at 677-78. That is the opposite conclusion had by the trial judge overseeing the case *sub judice.* And thus, *McWhorter* stands for the proposition that the Appellate Court will be deferential to the trial court's discretion. Second, what drove the trial court in *McWhorter* was not a comment about the jury's duty, but arguments about a news article which was not in evidence, and which the Plaintiff had sent back to the jury and the District Court had to retrieve. Worse, the jury commented on the missing exhibit. *Id*. at 676-78.

Defendant cites several other cases which, while perhaps providing different language to describe the standard, really apply the same one. In short, the alleged misconduct must be "clearly injurious" *Cote v. R.J. Reynolds Tobacco, Co.*, 909 F.3d 1094, 1104 (11th Cir. 2018) and "so pronounced and persistent that it permeates the entire atmosphere of the trial." *United States. v. Weinstein*, 762 F.2d 1522, 1542 (11th Cir. 1985).

Although Defendant devotes several pages of its brief on appeal to providing the comments the opening statement and closing arguments, and a great deal of

verbiage from the District Court expressing its displeasure with Plaintiff's counsel for violating its order, the reality is that it represents roughly 10 sentences in opening statement and closing argument. Unlike in *McWhorter*, the statements do not in any way argue evidence which was not before the jury. Unlike in *Allstate*, these statements do not suggest that the jury has a personal interest in the case. They did not "permeate the entire atmosphere of the trial." *Weinstein*, at 1542.

However, the intensity of the District Court's reaction to counsel's argument, and the fact that it considered the issue overnight, demonstrates that counsel's behavior was on the Court's mind. The District Court was well within its discretion, taking into account of the context of the entire trial and its observation of the jury to find that its contemporaneous admonishment of Plaintiff's counsel and instructions to the jury that the lawyer's comments are not evidence was sufficient, and in finding that the misconduct did not impair the jury's dispassionate consideration of the case. (DE#220:9-10). This was not error. Irrespective of the comments, the copious evidence – set forth in the Statement of Facts, *supra* – of its blatant, systemic race discrimination, including the admissions of its President and its Director of Legal Compliance is far more likely what drove the jury's verdict, particularly given the Court's repeated directions on what is and is not evidence.

**b. Cross Examination of Sookie Song.**

Defendant's corporate representative, Sookie Song had testified that, she rescinded Plaintiff's employment in reliance on an ADP background check which reported that Plaintiff had a misdemeanor conviction for disorderly conduct. Defendant then attempted to introduce a document which showed that conviction originally stemmed from a charge of aggravated assault. (DE#169-2:258-59). The District Court – weighing the probative value of this document against its tendency to cause undue prejudice but allowed Song to testify that she considered information that Plaintiff's misdemeanor conviction for disorderly conduct resulted from a plea deal after an arrest for aggravated assault. (DE#169-2:260-61; DE#220:11-12). Thereafter, Plaintiff's counsel posed a leading question: "you have not produced here any place where you're showing that you've gotten another piece of information right, your lawyer hasn't put it in to show that other than the ADP report, that you received something else, correct?" (DE#169-2:276-77). Before the witness could answer the question, Defense counsel objected. The witness never answered the question. (DE#169:277).

While it is true that counsel's question appeared "totally unfair" to the District Court[5], a number of factors informed the District Court's conclusion that it did not warrant a new trial. First, Defense counsel objected to the question in front of the

[5] (DE#220:13).

jury stating "[i]t has to do with the ruling. I didn't put it in." (DE#169-2:277). Second, the District Court sustained the objection in front of the jury and instructed the jury to "disregard any summary you heard about what is or is not in evidence." (DE#169-2:277; DE#220:11-12). The Court presumes that the jury follows its instructions. *United States v. Colston*, 4 F.4th 1179, 1192 (11th Cir. 2021). Third, Song did not answer the question and only her answer would have been evidence for the jury, not Counsel's question. (DE#169:277). Fourth, as the District Court noted, Song's prior testimony about Plaintiff's arrest for aggravated assault was "essentially unimpeached." (DE#220:14). Defendant's argument that the District Court's instructions caused the jury to believe no other evidence existed ignores the fact that the jury heard Song's unimpeached[6] testimony about her consideration of the aggravated assault charge.

It is within the sound discretion of the District Court to determine whether it is necessary to cure any defect and if so, how to do so. The District Court was present and watching the jury and the effect of the question posed to Song, and it was unimpressed. This was an appropriate use of its discretion and not error.

[6] To be clear, it was "unimpeached" in that there was no direct statement that she had not relied upon the aggravated assault charge. However, there was also testimony that Howard rescinded the offer at Liou's direction. And the long list of evidence that Defendant was making its decisions based upon race provided effective direct evidence of discrimination which impeached Song's assertion – and effectively proved to the jury that the decision was based upon race and not the arrest for aggravated assault.

**c. "Other Improper Trial Tactics."**

Defendant complains about "Other Improper Trial Tactics". This section gathers a list of items in an effort to draw a picture that the entire trial was badly infected when in fact, the key issues are 10 sentences in Plaintiffs, opening and closing and the one question put to Sookie Song. Defendant lists "arguing with the court in front of the jury after evidentiary rulings, coaching Faulk during his cross examination, making facial expressions visible to the jury but hidden from Dimerco's counsel, and repeatedly making speaking objections."

Clearly, the District Court took issue with counsel's conduct noting "I saw you [Plaintiff's counsel] from time to time smiling at your client, nodding with your client, and making other facial expressions to your client. Perhaps unintentionally. I did not say anything about it, although I think it inappropriate and I think the jury saw it." (DE#170:70). With respect to pushing arguments, the Court found that it was "largely outside the presence of the jury." (DE#220:11). But having watched the jury, "the Court [was] confident that the jury had a fair view of the evidence and was not impacted by her conduct." *Id.* Given that confidence, its decision to deny a new trial can hardly be considered an abuse of discretion.

## II. THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN BALANCING THE ADMISSION OF EVIDENCE PURSUANT TO FED. R. EVID. 403 RELATING TO PLAINTIFF'S 2014 AGGRAVATED ASSAULT CHARGE AND 2019 RAPE CHARGE.

Defendant next argues that the Court erred in excluding reference to Plaintiff's 2019 charge for rape, and the public criminal record related to the 2014 charge for aggravated assault (although the Court permitted testimony about it). The Court's decisions here reflect a very careful balancing of the probative value of evidence versus its unfair prejudicial effect pursuant to Fed. R. Evid. 403, and as discussed below, the Court was well within its sound discretion. There was no error on these points.

### a. The 2019 Rape Charge.

Defendant was not aware of the rape charges at the time it rescinded its job offer to Plaintiff. Defendant does not argue that the 2019 rape charge in any way affected its decision at the time. And Faulk was never actually convicted of those charges. Rather, Defendant urged the Court to admit them for the limited purpose of showing a potential alternative source of emotional distress.

Defendant argues that pre-trial the Court had determined to admit evidence of the 2019 arrest for rape for that purpose. The District Court made the determination to admit the evidence upon guidance from the Seventh Circuit's opinion in *Barber* which it found didactic. Defendant argues to this Court that "[c]ontradicting its earlier ruling and invoking the language of *Barber*, the court determined the charges'

prejudicial effect outweighed their now 'miniscule' probative value. … The inconsistency was glaring." (Def. at 38.) Defendant neglects to mention the careful review and application the District Court made of the principles from *Barber*, ***both before and during trial,*** the very different testimony that was elicited during trial than the Court had anticipated when it made its pre-trial ruling, and the Court's determination that the difference in that testimony demanded a different result given the guidance of *Barber*.

To understand how the District Court balanced these issues, the starting point must be *Barber*. There, the Plaintiff had been arrested for disorderly conduct. *Barber*, 725 F.3d at 706. While in police custody he was injured, taken to the hospital, and received several stitches. *Id*. at 707. He sued for assault. *Id*. As it happened, Mr. Barber had a prior conviction for possession of a stolen vehicle. *Id*. at 711. The District Court admitted it on grounds that it would provide an alternative explanation for his emotional distress just as Defendants in this case sought to use Faulk's arrest for rape. *Id*. at 711-12. The Seventh Circuit determined that because Barber had limited his testimony on damages to the incident involving the two officers he was suing and not emotional distress generally, it was of much smaller probative value than it might have been had Mr. Barber testified that he was suffering generally from emotional distress. *Id*. at 713-15.

The essence of *Barber* was a dichotomy between a broad claim of emotional distress affecting someone's life overall and a narrower claim of emotional distress specifically stemming from (and explained by) the specific violation at issue in the case. Where it is the former, other potential contributors to emotional distress become relevant. But with the latter, their relevance is greatly reduced and potentially outweighed by the prejudice they cause.

Appreciating that balancing act done by the Seventh Circuit in *Barber*, the District Court here initially determined to admit the evidence because, as the District Court understood it pre-trial, Plaintiff had no intention of limiting his "claim for emotional distress as the plaintiff did in *Barber*." (DE#136:8). But the Court was explicit that it would "revisit the issue" if Plaintiff's testimony regarding emotional distress was more limited at trial than anticipated. *Id*.

At trial, Plaintiff narrowed his testimony in a number of ways. First, the entirety of Plaintiff's testimony on damages was about how the discrimination made him feel. Upon finding out that the reason he did not get the job was because of his race, Plaintiff testified about thinking "what did I spend all of those years going through college for, [] getting my bachelors and my master's for what?" (DE#169-2:52-53). Indeed, the strongest discussion (at least verbally – the Court also observed Plaintiff's demeanor) was in the midst of his attorney asking him how bad the discrimination was and how it had compared to other discrimination in his life.

His response was that "this was like the worst thing. I mean, this is – it's –it's just – it's bad. Because I mean, I've tried, I've worked so hard in my life. I've worked so hard for this opportunity [] [a]nd [] put in all the work." (DE#169-2:59-60). Plaintiff's later testimony regarding emotional distress continued to focus on the emotional effect of realizing he had been denied the job because of his race – and lied to about it: "Well, because, I mean, I was discriminated in just, to me, it was one of the worst ways possible. And to not – to give me one reason and then it's a hiding everything covering up. And then I find out later that it was just due to the color of my skin. And there needs to be – and it wasn't just me. There's – it's systematic within the company…But it's just been – it's just been the hardest – I mean, it's been the hardest thing for me." (DE#169-2:76-77).

Just as important is that Faulk did not speak to a "broader feeling of malaise or depression, nor did he claim that his emotional trauma prevents him, for example, from fulfilling any future dreams or applying to other jobs." (DE#220:25). The Court, after intently watching Faulk's testimony, also noted "[h]is demeanor did not suggest that he experienced such emotions." *Id.*

Second, with all the things with which the District Court saw fit to take Plaintiff's Counsel to task, her closing argument did not exceed the bounds of this testimony. The District Court noted that "Plaintiff's counsel reiterated during her closing argument that, although Plaintiff had talked about other things in his life that

bothered him, Plaintiff was only asking the jury to compensate him for 'what happened here.'" (DE#220:25; DE#169-2:332).

The District Judge was not only present at trial, but in his own words "listened intently to Plaintiff's testimony surrounding this issue." (DE#220:28-29). More than that, he noted the force with which Plaintiff based his emotional distress testimony on just the discrimination itself: "[Plaintiff] has been adamant that his frustration here…is the assessment or evaluation of him based upon his race. And he has been linear and **vehement** in that." (DE#169-2:186) (emphasis added).

Defendant argues that Plaintiff's rape charge was still pending at the time he learned of the discrimination and, therefore, was relevant to his emotional distress. This misses the point. Plaintiff's testimony was not just limited *temporally* (to the time after he learned of the discrimination) but also *topically* (to the feelings he had about the discrimination itself). As the Court noted, Plaintiff did not testify to a "greater general malaise" that might have affected many areas of his life. (DE#169-2:94-96). Evidence about the rape charge – and even any emotional distress that charge may have caused him – would have "miniscule probative value" on the narrow issue of how the discrimination itself (and nothing else) affected Faulk. (DE#169-2:106).

Defendant also argues that *Bryan v. Jones*, 519 F. 2d 44 (5th Cir. 1975) directly contradicts the District Court's decision because the former Fifth Circuit "rejected

[a] finding that the plaintiff's testimony limited his damage claim to mental suffering caused by the knowledge of his wrongful restraint." Defendant reads too much into *Bryan*. There, the Court specifically found the testimony relevant because the plaintiff was complaining about having been incarcerated. While conceding that "[e]ven a minimal sort of penal confinement may be debilitating to many", the *Bryan* Court held, "this mental anguish may be much less for the recidivist than for one incarcerated for the first time." *Id.* Obviously, Faulk is not complaining of injury had by being incarcerated.

The District Court turned to *Barber* because there appear to be no cases in this Circuit addressing this specific question. While *Barber* is the most analogous case, the need for Rule 403's balancing is far stronger here. In *Barber* the Seventh Circuit was addressing the very weighing of probative value v. unfair prejudice under a number of evidentiary rules including not only 403, but 609(a)(1). And in *Barber*, what was at issue was, 1) a conviction, and 2) for possession of a stolen motor vehicle. *Barber's* conviction had to be admitted under Rule 609, subject to 403's probative v. prejudicial analysis, and in doing that analysis, the District Court in fact excluded it under Rule 609.

But Faulk was never convicted of rape. Even if had been so convicted, the potential for prejudice against Faulk of saying that he had raped and tried to strangle someone would be dramatic. It is not unlikely that the jury would have so hated

Faulk at that point that it might view any harm done to him by Defendant as just desserts irrespective of the illegality of it. Not only did the District Court not abuse its discretion in excluding the rape charge, but had it admitted the rape charge even if Faulk had ventured beyond the narrow scope of his damages testimony, Plaintiff would respectfully have been before this Court arguing that it was so inflammatory as to have deprived him of a fair trial.[7]

**b. Exhibit DX-17 Regarding the 2014 Aggravated Assault Charge.**

Defendant assigns error to the Court's decision to exclude the criminal history document which had been Defense Exhibit 17. The entirety of Defendant's argument is that the Court "had no legally cognizable basis to exclude the exhibit from evidence." (Def. at 42.) Defendant complains that the Court had planned to admit the document pre-trial and Plaintiff had not objected pre-trial. But Plaintiff did object during the trial. Defendant argues that the document is not hearsay. But nowhere does Defendant explain why the document should be admitted. Substantively therefore, that argument is waived. *Access Now, Inc. v. Southwest Airlines, Co.*, 385 F.3d 1324, 1330 (11th Cir. 2004) ("the law is by now well settled in this Circuit that a legal claim or argument that has not been briefed before the

[7] Defendant notes in its brief that Plaintiff did not object to the genuineness of the rape charges before trial. That may be true. But she (counsel) never conceded that it was appropriate to admit them into evidence irrespective of whether the charges were genuine.

court is deemed abandoned and its merits will not be addressed. …If an argument is not fully briefed … evaluating its merits would be improper.")

The argument was not really put to the District Court in the first instance either. At trial, Defendant sought to introduce the exhibit through Sookie Song for the purpose of showing that Plaintiff had been arrested for aggravated assault. The Court struck a compromise, namely that Song could testify that she knew Faulk had been arrested for aggravated assault and how that affected her decisions:

> THE COURT: I will let her testify about what she learned.
>
> MR. STASTNY: Um-hmm.
>
> THE COURT: And I will let her testify about what she did with it.
>
> MR. STASTNY: Okay
>
> THE COURT: But I won't let this document come in, because it has a lot of other stuff. Okay?
>
> MR. STASTNY: Okay. Fair enough.

(DE#169-2:260-61). From all appearances, Defendant accepted the compromise. There was no further argument on the point and other than suggesting that a redacted version be provided (with no explanation of how that would be done). Defendant never explained why the document had to be admitted. The Eleventh Circuit "has 'repeatedly held that 'an issue not raised in the district court and raised for the first time in an appeal will not be considered by this court.''' *Id* (internal citations omitted.) The argument is thus waived.

Finally, while the argument for admitting the document is unclear, it appears that Defendant used all the information it wanted. When the Court asked Defendant for the relevance of the document, counsel stated, "The relevance of it is that it indicates an aggravated assault, a bonding out for $5,000. She considered it in making her decision not to – to revoke the conditional offer for Mr. Faulk." (DE#169-2:258). The Court then asked counsel, "[t]he point is that you want to show that the original arrest was for something called aggravated assault?" Counsel's response was "Correct." (DE#169-2:259). Song indeed testified that she knew about the arrest for aggravated assault and that it was the basis for her decision to rescind Faulk's offer of employment. (DE#169-2:265, 269). All relevant information was therefore put into the record. The Court successfully balanced the concerns of all parties in this case.

## III. THE DISTRICT COURT COMMITTED NO ERRORS AND IF IT COMMITTED ANY, THEY WERE HARMLESS AND NON-CUMULATIVE.

Defendant, in somewhat conclusory fashion argues that even if the assigned errors are harmless that their cumulative effect denied it a fair trial. But Defendant fails to fully identify the errors nor fully explain how they had a cumulative effect. The totality of Defendant's presentation on these issues is "Faulk's counsel's misconduct and improper questioning of Dimerco's key witness, and the court's

exclusion of critical defense evidence, among other errors, cumulatively denied Dimerco a fundamentally fair trial." (Def. at 44.)

In considering whether an aggregation of otherwise harmless errors requires reversal when the errors individually do not, the Court considers several factors:

> (1) "the nature and number of the errors committed;" (2) "their interrelationship, if any, and combined effect;" (3) "how the district court dealt with the errors as they arose (including the efficacy—or lack of efficacy—of any remedial efforts);" (4) "the strength of the government's case[;]" and (5) "the length of trial." Id. (citations omitted).

*United States v. Graham*, 123 F. 4th 1197, 1283 (11th Cir. 2024).

Presumably, by "misconduct," Defendant here refers to Plaintiff's counsel's opening statement and closing argument regarding the torch and the mantle. Presumably by "improper questioning" Defendant refers to the question of Sookie Song about DX-17 which Song never answered. And presumably "exclusion of critical defense evidence" refers to the aforementioned DX-17 and the Rape charge. Beyond that, it is unclear what is being referenced by "among other errors."

Given the abuse of discretion standard, and the extensive and considered responses by the District Court to each issue, neither the District Court nor Plaintiff believes there are any errors in the first instance. But assuming that these items were ***all*** errors, an application of the factors espoused by *Graham* demonstrate that reversal on the basis of cumulative errors is inappropriate.

To meet the first element, Defendant needs to how "many" errors. *United States. v. Ochoa*, 941 D.3d 1074, 1106 (11th Cir. 2019) (*quoting United States v.* Baker, 432 F.3d 1189, 1223 (11th Cir. 2005)). The four items (the opening and closing, the examination of Song, DX-17, and the rape charge) are not "many errors."

The second factor inquires about their interrelationship so as to have a combined effect. The question of Song and the exclusion of Exhibit 17 certainly interrelate. The rape charge had nothing to do with Song's reason for terminating Faulk (it was for the purpose of addressing damages) so there is no relationship or cumulative effect with any other alleged error. And Counsel's discussion of the torch or mantle was wholly unrelated to the other two.

The District Court in this case was paying very close attention and worked hard to ensure a fair trial. The Court not only sustained objections in front of the jury, but gave instructions (e.g., that the jury was not to take Counsel's questions as evidence.) Plaintiff respectfully submits that the third factor militates against a finding of cumulative error.

Finally, Plaintiff's case was extremely strong. Even before Renee Howard's testimony, the emails from Liou alone demonstrated that race was a motivating factor and far outweigh the Exhibit 17 that Song was permitted to describe.

Finally, this was a very short trial. Testimony took a little over two days. Neither fatigue nor complexity would increase the likelihood of harm.

Defendant has not explained how any errors accumulated to its disadvantage. But even so, Plaintiff respectfully argues that the District Court made no errors, that it competently addressed the issues that did arise, and that even if any errors occurred, they were so minor and unrelated that the did not result in denial of a fair trial.

## IV. THE JURY WAS ENTITLED TO AWARD $300,000 IN COMPENSATORY DAMAGES.

Defendant argues that the "only support for Faulk's substantial $300,000 award for emotional distress is his own conclusory testimony that he felt 'mad' and 'upset' upon learning of Dimerco's actions 18 months later and he was frustrated about the perceived effect on his career trajectory." (Def. at 46). Once again, Defendant's representations give less than the full picture.

The availability of compensatory damages and the amount of compensatory damages are two different things. This Court explained the difference in *Ferrill v. The Parker Group, Inc.*, 168 F.3d 468, 476 (11th Cir. 1999): "Although compensable damage must be proven … general compensatory damages, as opposed to special damages, need not be proven with a high degree of specificity. Compensatory damages 'may be inferred from the circumstances as well as proved by the testimony.'" (*citing Carey v. Piphus*, 435 U.S. 257, 263 -64 (1978) and *quoting*

*Gore v. Turner*, 563 F.2d 159, 164 (5th Cir.1977)) "Any evidentiary shortcomings 'go more to the amount, rather than the fact, of damage,'" *Id* (*quoting Marable v. Walker*, 704 F.2d 1219, 1220 (11th Cir.1983)).

The standard for review is again very deferential. "Once a defendant is found liable for the plaintiff's injury, the District Court has a great deal of discretion in deciding the level of damages to be awarded." *Id* (*citing Stallworth v. Shuler*, 777 F. 2d 1431, 1435 (11th Cir. 1985) "When an award of damages has been reviewed and upheld by the trial judge, it is entitled to a presumption of validity." *Id.* (*citing Honda Motor Co., Ltd. v. Oberg,* 512 U.S. 415, 421 (1994).

There is good reason for such an award to be entitled to a presumption of validity. The trial court is in the best position to judge the testimony. That is particularly true in this case, in which the District Court observed and commented at length on Faulk's emotional distress testimony:

> The Court observed Plaintiff throughout trial and particularly while he testified. Plaintiff's demeanor conveyed the embarrassment and pain he experienced because of Defendant's actions. The Court has difficulty adequately describing his demeanor other than to say Plaintiff's body language, tone of voice, and overall appearance while testifying about how he felt when he learned he had been denied employment because he is black evidenced profound sadness, anguish, and humiliation. The Court finds Plaintiff's testimony recounting Defendant's conduct and his resultant emotional suffering was sufficient to support the jury's award of emotional distress damages.

(DE#220:37).

While *Ferrill* is the key 11th Circuit case on point, cited more than 400 times, Defendants have relied on *Akouri v. Fla. DOT, 408 F.3d 1338, 1341 (11th Cir. 2005)* and the Fifth Circuit's opinion in *Brady v. Fort Bend County*, 145 F.3d 691, 719 (5th Cir. 1998) and the Fourth Circuit's opinion in *Price v. City of Charlotte*, 93 F.3d 1241 (4th Cir. 1996), which *Brady* references. Essentially, the Fourth Circuit in *Price* did a survey of several other circuits, including the Second, Third, Seventh, and Tenth. In so doing, *Price* prepared a list of the factors to be considered, the same list this Court included in footnote 5 of *Akouri*:

> (1) whether the plaintiff lost the esteem of his/her peers;
>
> (2) whether the plaintiff suffered physical injury as a consequence of her emotional distress;
>
> (3) whether the plaintiff received psychological counseling or other medical treatment;
>
> (4) whether the plaintiff suffered a loss of income;
>
> (5) the degree of emotional distress;
>
> (6) the context of the events surrounding the emotional distress;
>
> (7) the evidence tending to corroborate the plaintiff's testimony;
>
> (8) the nexus between the challenged conduct and the emotional distress; and
>
> (9) any mitigating circumstances.

*Akouri*, 408 F.3d at 1345 n.5. Bearing in mind that these are factors and not elements, it is clear that when looking at the whole of Faulk's testimony, his complaints of

emotional distress are far more than the conclusory statements of "mad" and "upset" as represented by Defendant.

First is number 4, a loss of income. The jury awarded Faulk $90,000 in lost income which Defendant is not even appealing. Next is number 5, the degree of emotional distress. As already described, Faulk testified at length to how it affected him and the Court noted that "Plaintiff's body language, tone of voice, and overall appearance while testifying about how he felt when he learned he had been denied employment because he is black evidenced profound sadness, anguish, and humiliation." (DE#220:37).

And finally, taking numbers six and eight together, the context of events and the nexus between the challenged conduct and the emotional distress. As already discussed at length in Section II.a, Faulk testified about how he felt that all the work he had put into building himself, his education, his experience, etc., was essentially for naught because of this company had made up its mind not to hire him because of the color of his skin. (DE#169-2:52-53, 56). That considerable testimony is far more than feeling "mad" and "upset".

Defendant also compares Faulk's compensatory damages award to those awarded in other cases including *Akouri* which eliminated a $552,000 award, *Wilson v. Taylor*, 733 F.2d 1539 (11th Cir. 1984) reducing a $100,000 award to $10,000, *Schandelmeier-Bartels v. Chicago Park District*, 634 F.3d 372 (7th Cir. 2011) which

reduced a $200,000 award to $20,000, and *Forshee v. Waterloo, Indus., Inc.*, 178 F.3d 527 (8th Cir. 1999) reversing a $9600 damages award altogether. If one looks hard enough, it is not that difficult to find cases where courts reduced awards. But this is a case specific factual question. *Akouri* had very little testimony about emotional distress (and the trial court had already found insufficient evidence of lost wages) but he argued that he had testified "with emotion." Unlike here, the trial judge did not see it that way and struck the compensatory damages award. This Court did not find an abuse of discretion. The other cases, *Wilson*, *Schandelmeier-Bartels*, and *Forshee* represented situations where the testimony in support was borderline non-existent. In *Wilson* the plaintiff felt betrayed, frustrated and angry. "Q: Did you feel any mental anguish? A. I was mentally frustrated at that point." *Wilson*, 733 F.2d at 1549. In *Schandelmeier-Bartels*, the plaintiff felt disturbed, devastated, and upset, but the award of $200,000 was for being twice yelled at and the Court still gave her $20,000 more than a decade ago. And *Forshee* is an outlier because the issue was not about how much in damages, the Eighth Circuit simply barred her from claiming damages at all because it was based upon testimony that she went home and cried for the rest of the day. Even so, the Eighth Circuit's decision therein would seem at odds with this Court's decision in *Ferrill.*

But even *Schandelmeier-Bartels* was cautious about challenging the award by comparison to other cases "Due to the highly fact-specific nature of Title VII cases,

such comparisons are rarely dispositive." *Schandelmeier-Bartels*, 634 F.3d at 390 (*quoting Lampley v. Onyx Acceptance Corp*., 340 F.3d 478, 485 (7th Cir. 2003)). In the next sentence, *Lampley* states "[w]e therefore conclude that the district court did not abuse its discretion in denying a new trial or remittitur with respect to the compensatory damages award." *Lampley*, 340 F.3d at 485.

*Lampley's* point is well taken and this Court essentially made the same point nearly 50 years ago in *Sykes v. McDowell* 786 F.2d 1098, 1105 (11th Cir. 1986) stating:

> A court's refusal to grant a new trial on the grounds of inadequate or excessive damages is a matter within the sound discretion of the district court. It should be overturned only in exceptional circumstances. "The power of an appellate court to review the excessiveness of a verdict is extremely limited," and "great caution should be exercised before the appellate courts interfere." A jury verdict may be vacated as excessive only if it is "so large as to shock the conscience.

*Id* (internal citations omitted.)

Just as Defendant was able to identify a set of cases from across the country where conclusory statements of damages were reduced, Plaintiff here can point to a plethora where the damages were much higher. The District Court cited to *Bogle v. McClure*, 332 F.3d 1347 (11th Cir. 2003) which awarded $500,000 which the Court noted would be $850,000 today. While *Bogle* involved evidence of a broader impact of race discrimination, it would still be nearly three times as much as Faulk received here. Similarly, in *LIAT (1974) v. Cherubin*, 77 V.I. 472 (Virgin Islands 2022), the

Court approved an award of $1,551,320 in compensatory damages. Mr. Cherubin's nephew testified (in a rather conclusory manner) that "'[Cherubin]'s never been the same person from that day.'" *Id* at 489 and a friend who said that "changed as a person after the incident." *Id* at 490. And that award is five times Faulk's award. In *Bihun v. AT&T Information Systems, Inc.*, 13 Cal. App. 4th 976 (Cal. 2nd Dist. 1993) the court approved $663,000 where a treating physician testified that a sexual harassment victim suffered a low-grade depression. This case might seem to be more serious, but how much is hard to say. Still $663,000 in 1993 would be over $1.4 Million today.[8] In *Cuevas v. Wentworth Group*, 226 N.J. 480 (N.J. 2016) the Court approved awards of $800,000 and $600,000 for two brothers who faced racial comments in meetings related to complaints that there was a lack of Mexican restaurants in the area and the inability to get burritos, and a "quip" from a co-worker that he thought Plaintiff had a "little Taco Bell Chihuahua dog." *Id* at *2 and the employees were terminated for poor work performance. In *Evans v. Port Authority of New York & New Jersey*, 273 F.3d 346 (3rd Cir. 2001) the District Court remitted a $1,000,000 compensatory damages award to $375,000 ($680,000 today.) In that case the plaintiff was denied a promotion and contended that the defendant sought to deny her an opportunity for advancement.

---

[8] This was done using Rom Economics Inflation Calculator found at https://www.romeconomics.com/calculator/inflation/. That calculator is used throughout this brief for such comparisons.

While courts have endorsed the exercise of comparing verdicts to a degree, in the end, there is little point in having this Court play a game of "find that verdict" when the District Court took great care to consider the award and do the analysis. Given the District Court's findings in this case, $300,000 in compensatory damages does not shock the conscience. *Sykes*, at 1105.

## V. THE JURY WAS ENTITLED TO AWARD $3,000,000 IN PUNITIVE DAMAGES.

While the compensatory damages award in this case does not shock the conscience, Defendant's intentional, planned, and blatant discrimination designed by its top executive and the effort to cover and enable it by its head of legal compliance (because blacks do not understand ginseng) by rewording emails certainly does. Defendant's challenge to the punitive damage award is rooted in the argument that it did not discriminate in the first instance. The jury clearly concluded that it did and this Court should defer to the Jury's finding on that fact.

As did the District Court, Defendant conducts the analysis according to *BMW of North America, Inc. v. Gore,* 517 U.S. 559 (1996). But Defendant's application of that analysis to the facts of this case is erroneous.

### a. Reprehensibility.

As Defendant notes, the "dominant consideration in evaluating a punitive damages award is the reprehensibility of the defendant's conduct." (Def. at 48.) *See also State Farm* at, 419; *Goldsmith v. Bagby Elevator Co., Inc.* 513 F.3d 1261, 1283

(11th Cir. 2008). Analyzing the degree of reprehensibility takes the Court on a tour of five factors which are not evenly weighted and which are not all required to support the award. Plaintiff addresses each factor below, but in this case, it is the last two which are truly controlling.

**i. Whether Plaintiff Suffered Harm.**

The first factor asks whether the Plaintiff suffered physical harm rather than just economic harm. The Eleventh Circuit has clarified that "physical harm" also includes emotional harm. *Goldsmith*, 513 F.3d at 1283; *See also Williams v. First Advantage LNS Screening Solutions, Inc.*, 947 F. 3d 735, 751 (11th Cir. 2020). Ignoring those opinions altogether, Defendant argues that this factor favors it because Plaintiff suffered economically and emotionally, but not physically. While in the long run, the question of how reprehensible Defendant's conduct was is a different question, Defendant's statement here is simply a demand that this Court ignore the law of this Circuit.

**ii. Whether the Conduct Evinced Indifference to Health of Others.**

The District Court found that this factor favored Defendant. Plaintiff does not disagree. This is not a physical case.

**iii. Whether the Target Was Vulnerable.**

The third factor asks whether the target of the conduct was financially vulnerable. But once again, this Circuit does not view the factor in quite so limited

a fashion. In *Myers v. Central Florida Invs., Inc.*, 592 F.3d 1201 (11th Cir. 2010), this Court approved a determination by the District Court that "the events did occur in the workplace and Plaintiff's boss -- who controlled Plaintiff's earnings -- was the one who committed the acts." *Myers*, at 1219-20 (citations omitted.) The same clearly holds true here although the acts go well beyond a supervisor. Plaintiff was never hired, but Herbert Liou controlled Plaintiff's ability to hold the job. And of course, the jury awarded (and Defendant does not challenge) $90,000 in lost wages. Again, while how reprehensible the conduct was is a different question, the facts of this case obviously meet this factor and Defendant's statement "the [district] court clearly erred in finding this factor favors Faulk" once more demonstrates Defendant's willingness to ignore the precedent of this Circuit and the facts found by the jury.

**iv. Whether the Conduct Was Repeated or Isolated.**

The fourth factor asks whether the conduct involved repeated actions or was an isolated incident. The facts of this case go well beyond a concept of "repeated actions." The discrimination at play here was part of a plan and policy. There was a great deal of testimony on this point. Rather than hiring Plaintiff, Defendant hired a white male who had a more significant criminal record than Plaintiff. Why? Because "Mr. Liou [President of U.S. Operations] explained [] that he only wanted to hire whites" and that "whites could [] get in the door with customers while

minorities could not." (USCA11#23:85). This represents a plan by Liou not just directed at Faulk (the victim in this particular circumstance) but at every minority who person. In the words of the District Court "Defendant's misconduct against Plaintiff was neither isolated nor accidental but rather systematic and intentional." (DE#220:45). That system had been in place for some time as Liou had carefully prepared the plan Chien the prior year and vetoed the effort to hire "any candidates" who were not white, and "many were rejected because of their race and ethnicity." (USCA11#23:82).

Well after Plaintiff's job offer had been rescinded, Liou persisted in his discriminatory conduct and did so in the face of resistance by his subordinates. While members of the Atlanta team themselves had no objection to hiring diverse candidates, Liou hamstrung Howard's ability to fill the position because of his refusal to permit her to hire minority candidates. (USCA11#23:82, 85). Indeed, Liou's discriminatory plan was so blatant and persistent that Howard told him point blank that "it's discriminating to search for candidates based on race and age." (USCA11#23:94-96; DE#168:98-100; PE#164-6:6614-15). Not to be deterred by Howard's meddling, Liou drafted an email "I would like you to understand the Character of Sales to fit our Biz: a) [Defendant] is focusing on Caucasian Market." (USCA11#23:45-46; DE#168:100-102; PE#164-6:6614).

Defendant on the other hand has determined that "[t]his fourth factor either supports Dimerco or is neutral at worst." (Def. at 51). That comment simply defies logic. Defendant's analysis is not based on the Jury's findings, but rather on its own rejected story: "The court's finding of a pattern of discriminatory behavior by Dimerco was also contrary to the evidence which showed that Faulk was offered a position by Atlanta branch manager Song, who revoked it after learning of his prior aggravated assault charge, regardless of his race." (Def. at 50.) Starting from that premise, Defendant is not challenging the imposition of punitive damages or the amount, it is challenging liability altogether. In short, Defendant rejects the standard of review that this Court applies which requires it to accept the facts that are most consistent with the jury's verdict. *Willingham v. Loughnan*, 261 F.3d 1178, 1185 (11th Cir. 2001).

**v. Whether the Conduct Was Intentional, Malicious, or Deceitful.**

The last factor asks whether the harm was the result of intentional malice, trickery, or deceit, or mere accident. Defendant argues that "the court's finding that Dimerco acted with 'malice and deceit' was clearly erroneous. The evidence showed no intent to harm Faulk." (Def. at 51.) Once again, Defendant rejects the appropriate standard of review (and concomitantly, the Seventh Amendment.)

Taking the evidence in the light most favorable to the jury verdict, as already discussed, Herbert Liou executed a specific plan to discriminate against minorities

developed well before Faulk ever applied. Indeed, he provided a series of written plans which included the following:

> - "**Hiring Caucasian Sales & Marketing Manager/VP in LAX/NYC respectively.**" (DE#168:63, 67-68; PE#164-38:11158).
>
> - "**Continue Pairing Concept by leveraging Caucasian Sales & Marketing Manager/VP and Ted to assist local office closing sizeable A/C**" (DE#168:63, 68; PE#164-38:11158).

Faulk was a victim of that plan.

Based on the jury's verdict, "intent" to discriminate is a forgone conclusion. But Defendant's collective actions after Renee Howard challenged Herbert Liou's plan for discrimination are even more telling. As just noted, Liou sent an email pressing that plan. He sent that email to Cathy Chou. Chou's job was to ensure that the company is in compliance with the law. (USCA11#23:17, 20-23, 35). She should have put a stop to Liou's discriminatory plan. She certainly understood that he was violating the law. In the District Court's words "Ms. Chou did not seek to prevent Mr. Liou's clearly discriminatory practice but rather to 'rewrite' the message so Mr. Liou's intention was not so clearly on display." (DE#220:47). In other words, rather than bring the company into compliance with the law, Chou sought to assist the company in evading the law -- she sought to accomplish the discrimination by "deceit."

**b. Ratio of Compensatory to Punitive Damages.**

The Supreme Court addressed the idea of using a ratio of compensatory to punitive damages with great caution. In *Gore* it noted that, "[w]e have consistently rejected the notion that the constitutional line is marked by a simple mathematical formula." *Gore* at 582 (1996). While it is true that *State Farm* discussed the use of double, treble, or quadruple damages as statutory awards in some contexts as instructive, it was careful to say that they were not binding. *State Farm* at 425 . It spoke in terms of what is "likely to comport with due process," but naturally could not address any case without reviewing the facts. But on its facts, a $145 Million punitive damages award (a 56:1 ratio) was excessive.

The District Court approached its analysis noting that this Court in *Rubinstein v. Yehuda*, 38 F. 4th 982, 988-89 (11th Cir. 2022) saw a 4:1 to one ratio as being "close to the line," but noted that higher awards have been approved. *Id.* And in keeping with *State Farm* the District Court also analyzed the case based upon the evidence before it and the Jury. While this Court reviews the District Court's application of the law *de novo*, on a motion for new trial it reviews for an abuse of discretion. The review is more stringent where district court disagrees with the jury's assessment and concomitantly more differential where the district court agrees with the jury. *Butcher v. United* States, 368 F.3d 1290, 1297 (11th Cir. 2004) (*citing*

cases. In this case the District Court not only agreed with the jury but described Defendant's conduct as "extreme." (DE#220:51).

Nonetheless, the ratio in this case was roughly 7.69:1, hardly the 500:1 ratio approved in *Gore* or the 56:1 ratio with which the Supreme Court started in *State Farm* (not to mention that the award was nearly 50 times higher.) Even *State Farm* implicitly acknowledged that in some few cases it may be appropriate to exceed a 10:1 ratio and to do so to a significant degree: "few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process." *State Farm,* 538 U.S. at 425. A ratio of 7.69:1 in this case not only falls within single digits, but Defendant's conduct is such that had it exceeded single digits it would still satisfy due process.

Not happy with *State Farm's* concession that some few cases might still justify exceeding a single-digit (10:1) ratio or even *Rubenstein's* comment that despite *William's* acceptance of a 500:1 ratio that a general rule of thumb of 4:1 will be close to the limit in most cases, Defendant argues for a ratio of 1:1. To do that it cites half a dozen cases where the ratio either was or was reduced to 1:1 or less. Those cases include *Williams v. ConAgra Poultry Co*., 378 F. 3d 790 (8th Cir. 2004), *Thomas v. iStar Financial Inc.*, 652 F.3d 141 (2d Cir. 2010), *Sooroojballie v. Port Authority of N.Y. & N.J.*, 816 Fed. Appx 536 (2d. Cir. 2020), *Dimanche v. Massachusetts Bay Transportation Authority*, 893 F.3d 1 (1st Cir. 2018), *Saccameno*

*v. U.S. Bank National Association,* 943 F.3d 1071 (7th Cir. 2019), and *Goldsmith.* But the facts of these cases are a far cry from those which led to the punitive damages award here.

In *ConAgra*, the Eighth Circuit reduced a $6 million award which would otherwise have been appropriate but for the fact that it determined that the defendant could not be punished for conduct that was not at issue (e.g., nooses and KKK parties of which Plaintiff was not even aware). *ConAgra*, at 797-98. In *Thomas* the Second Circuit noted that the conduct, which included ignoring complaints of race discrimination, was "at the very least more than merely negligent." *Thomas*, 148. *Sooroojballie,* had a pattern of harassing behavior and a false accusation of sabotage. *Dimanche*, involved a failure of the company to investigate complaints of and discipline of racially demeaning comments. *Saccameno* was a very complicated mortgage situation which the court found was reckless but not intentional. And *Goldsmith* related to termination for refusing to sign an arbitration agreement. With exception of the facts upon which the Eighth Circuit in *ConAgra* determined that the District Court could not rely, none of these cases reflect conduct that even resembles the persistence of USA President Herbert Liou, in pursuing and executing a system of discrimination in the face of resistance from his subordinates, nor the effort of his in house legal counsel to adapt that plan so to hide its discriminatory intent.

**c. Comparable Cases.**

Defendant argues that "The Punitive Award Greatly Exceeds Analogous Civil Penalties" by essentially arguing that the Title VII caps should be applied to this §1981 claim: "Courts in Section 1981 cases have compared punitive damages to Congress' $100,00 damages cap (for companies Dimerco's size) … for **all** non-back pay damages under Title VII. ... Faulk's $3,000,000 award surpasses this cap and should be reduced." (Def. at 57 emphasis in original.) For this proposition, Defendant cites to *ConAgra* and *Copley v. BAX Global, Inc.*, 97 F. Supp. 2d 1164 (S.D. Fla. 2000). To be clear, these cases do not advocate for the proposition as Defendant does. *ConAgra* explicitly rejects using Title VII by analogy: "Furthermore, in making the decision to limit damages in Title VII cases, Congress made the implicit judgment not to limit damages in § 1981 cases. Hence it would be inappropriate for the courts simply to extend the Title VII limitations to § 1981 cases under the guise of interpreting the Constitution." *ConAgra* at 798. *Copley* takes the same view. "The damages caps of § 1981a(3) are explicitly made inapplicable to actions, such as this one, brought under § 1981. See 42 U.S.C. § 1981a(4)." *Copley* at 1173.

Both cases involved relatively benign (relative to the case at bar) discrimination. Once the Eighth Circuit eliminated all of the serious conduct (black dolls hanging from nooses, KKK parties, etc.), it limited consideration of punitive

damages to the specific acts taken against the Plaintiff therein – which were apparently minor enough that the appellate court determined not to describe them beyond "racially motivated harassment" and discriminatory termination. *Copley* involved what might be termed a "reverse discrimination" discriminatory termination, but again did not find any facts important enough to express. And yet they were facing punitive damage verdicts in excess of $6,000,000 and $500,000 respectively. Perhaps because the acts were relatively commonplace neither court did a full reprehensibility analysis and neither found it helpful to hunt for analogous cases. Even so, after all reductions, both courts exceeded $300,000 ($600,000 in *ConAgra* and $350,000 in *Copley*).

While Defendant does not play "find that case" in this section of its brief, it did present several cases in the last paragraph of the prior section which it presumably meant to relay here. Those cases include *Goldsmith, EEOC v. W&O Inc*., 213 F3d 600 (11th Cir. 2000), *Bryant v. Jeffrey Sand Co*., 919 F.3d 520 (8th Cir. 2019), *Bowles v. Osmose Utilities Services, Inc*., 443 F.3d 671 (8th Cir. 2006), and *Baines LLC v. Arco Products Co*., 405 F.3d 764. For the same reasons just discussed, *Goldsmith* is a wholly different kind of case. But none of the others approach the detailed, systematic plan of discrimination executed here by Defendant's President, Herbert Liou, who was persistent in the face of resistance from management below him and aided by the legal compliance officer's efforts to mask it. Neither are they

so blatant with plans including "Hiring Caucasian Sales & Marketing Manager/VP" or "Continue Pairing Concept by leveraging Caucasian Sales and Marketing Manager/VP." (DE#168:63, 67-68; PE#164-38:11158). None had a presentation that specified that the ideal candidate was "American and Caucasian (preferred) ethnicity." (USCA11#23:91-92; PE#164-5:47). By comparison, the discrimination in Defendant's cases was practically benign: *W&O* asked pregnant women to stop carrying trays after five months into pregnancy because they might drop them; *Bryant* included racial slurs which caused no damage at all (the jury awarded $1 nominal for compensatories); *Bowles* once again reflected the use of racial slurs; and the same was true for *Baines* where the plaintiffs were called "raghead," "diaperhead" and other unsavory names and were stalled with security delays.

But just as Defendant can play find that case and identify a dozen cases which bear no relationship to the pernicious nature of its plan of action in this case, Plaintiff can equally find cases that demonstrate much larger awards. *See e.g., Chopourian v. Catholic Healthcare West*, 2012 U.S. Dist. LEXIS 60327 (E.D. Cal. 2012) (awarding $56 Million for hostile work environment and retaliation – vacated on account of settlement). But what neither party has been able to find are cases with facts analogous to those now before the Court. There are numerous discrimination cases in state and federal cases across the country. But direct evidence cases are exceedingly rare. But Kenny Faulk has not just brought a direct evidence case, but

one that is based on a specific plan of discrimination demanded by the President of the company in the face of objections from his management and a plan by the legal compliance officer to enable the discrimination by keeping it in the shadows. In sum, while there are cases involving physical harm, hate crimes, and sexual assault that demand significant punitive damage awards, neither party nor the District Court found any cases similar in both kind and degree as that now before the Court.

#### d. The Purpose of the *Gore* Analysis.

The principles behind the *Gore* analysis in the first instance is to ensure that parties not be taken by surprise. *Gore* begins the analysis with the following fundamental principle: "Elementary notions of fairness enshrined in our constitutional jurisprudence dictate that a person receive fair notice not only of the conduct that will subject him to punishment, but also of the severity of the penalty that a State may impose." *Gore*, 517 U.S. at 574. Defendant did not enter upon its discriminatory plan lightly. It had a Legal Compliance Director in the person of Cathy Chou. Cathy Chou was not only well versed in the law, but she specifically told Herbert Liou that his conduct "will result in a guilty verdict and large damage award." (USCA11#23:45-46; PE#164-26:8886). (That is not entirely accurate. Her real statement was that wording the email to admit to discrimination would result in a large damage award – in other words, only if they got caught.)

Clearly Cathy Chou had fair notice not only of the conduct that would subject Defendant to punishment but that it would be a large damage award. Defendant earned the punitive damages verdict in this case by significant effort. It was no surprise. It therefore objectively fits within the goals of *Gore* irrespective of the full analysis.

## CONCLUSION

For the reasons set forth above, Plaintiff respectfully prays that the District Court's damages judgment and order denying a new trial be AFFIRMED.

This 12th day of March 2025,

Respectfully submitted,

/s/ *Aaron B. Maduff*
Aaron B. Maduff
Benjamin A. Stark
Counsel for Appellee

Aaron B. Maduff
BARRETT & FARAHANY
77 W. Wacker Dr., 45th Floor
Chicago, Illinois 60601
(312) 276-9000
aaron@justiceatwork.com

Benjamin A. Stark
BARRETT & FARAHANY
2921 Piedmont Road
Atlanta, Georgia 30305
(404) 214-0120
bstark@justiceatwork.com

*Counsel for Plaintiff-Appellee*

## CERTIFICATE OF COMPLIANCE

I hereby certify in accordance with FRAP 32(g)(1) that this brief complies with the type-volume limitation specified in Rule 32(a)(7)(B). Specifically, it contains 12,911 words in the Brief.

/s/ *Aaron B. Maduff*
Aaron B. Maduff
Georgia Bar No. 548978

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on March 12, 2025, I electronically filed the foregoing ***Appellee's Response Brief*** with the Clerk of Court using the CM/ECF system which will automatically send email notification of such filing to all attorneys of record.

/s/ Aaron B. Maduff
Aaron B. Maduff
Georgia Bar No. 548978

*Attorney for Appellee*
*Kenny Faulk*